CHAD A. READLER
Acting Assistant Attorney General

JOSEPH H. HARRINGTON
Acting United States Attorney

TERRY M. HENRY
Assistant Branch Director

ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, D.C. 20530
Tel: (202) 616-5084
Fax: (202) 616-8470
E-Mail:  andrew.warden@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| IN RE APPLICATION OF ZAYN AL-ABIDIN MUHAMMAD HUSAYN (ABU ZUBAYDAH) and JOSEPH MARGULIES | No. 17-CV-171-JLQ<br><br>UNITED STATES' MOTION TO QUASH SUBPOENAS ISSUED TO JAMES MITCHELL AND JOHN "BRUCE" JESSEN AND MOTION FOR PROTECTIVE ORDER<br><br>Hearing Date:  Nov. 28, 2017 at 10 a.m. With Oral Argument By Telephone |

UNITED STATES' MOTION TO QUASH SUBPOENAS

## <u>INTRODUCTION</u>

Pursuant to Federal Rule of Civil Procedure 26(c) and 45(d)(3)(A), the United States of America moves for a protective order and to quash the subpoenas for documents and deposition testimony that Petitioners Abu Zubaydah and Joseph Margulies served on Respondents Dr. James Mitchell and Dr. John "Bruce" Jessen.  As an initial matter, the Court lacks jurisdiction over this case pursuant to 28 U.S.C. § 2241(e)(2), which bars jurisdiction over any non-*habeas* action "against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant."

Even if the Court concludes it has jurisdiction, the Court should enter a protective order and quash the subpoenas in their entirety because the subpoenas seek privileged information protected from disclosure by the state secrets privilege as well as the National Security Act, 50 U.S.C. § 3024, and the Central Intelligence Agency ("CIA") Act, 50 U.S.C. § 3507.  Abu Zubaydah's subpoenas seek a wide range of information from Dr. Mitchell and Dr. Jessen about the CIA's alleged detention and interrogation activities allegedly occurring in Poland, as well as information about Poland's alleged participation in those alleged activities.  But whether or not the CIA conducted detention and interrogation activities in Poland, or with the assistance of the Polish Government, is a classified fact and is national security information protected from disclosure by the United States' assertion of the state secrets and related statutory privileges.  Here, the Director of the Central Intelligence Agency, Michael Pompeo, has properly invoked the

UNITED STATES' MOTION TO QUASH SUBPOENAS - 1

state secrets privilege by submitting a declaration explaining that the information Abu

Zubaydah seeks would risk the disclosure of classified and privileged national security

information about the operation of the CIA's former detention and interrogation

program, particularly information that would tend to reveal the locations of CIA

facilities or the foreign governments that assisted the CIA in connection with the

program.  Such information confirming or denying whether the CIA conducted detention

and interrogation activities in Poland, or with the assistance of the Polish Government,

cannot be disclosed without risking serious – and in some instances, exceptionally grave

– danger to the national security of the United States.  *See* Decl. and Formal Claim of

State Secrets Privilege and Statutory Privileges by Michael Pompeo, Dir. Of The CIA

("Second Pompeo Decl.") (attached as Exhibit 1).

Based on prior decisions from this Court and the Court of Appeals, the state

secrets privilege prohibits the disclosure of the information called for by the subpoenas.

In *Mitchell v. United States*, 16-MC-0036 (JLQ), this Court recently upheld the United

States' assertion of the state secrets privilege over the same categories of information at

issue in this case.  *See* Order Re: Third and Fourth Motions To Compel and Assertion of

State Secrets Privilege (May 31, 2017) (ECF No. 91) (hereinafter *Mitchell* Order)

(attached as Exhibit 2).  In reaching this conclusion, the Court relied primarily on the

Court of Appeals' decision in *Mohamed v. Jeppesen Dataplan, Inc*., 614 F.3d 1070 (9th

Cir. 2010) (en banc), which upheld the United States' assertion of the state secrets

privilege with respect to similar, and in some instances, identical categories of classified

information about the operation of the CIA's former program, including information

about whether any foreign governments cooperated with the CIA.  Abu Zubaydah's

UNITED STATES' MOTION TO QUASH SUBPOENAS - 2

1   subpoenas seek discovery of the same categories of classified national security

2   information that both this Court and the Court of Appeals have concluded are protected

3   from disclosure by the state secrets privilege.  Accordingly, as explained further below,

4   the Court should enter a protective order prohibiting the disclosures called for by the

5

6   subpoenas and grant the United States' motion to quash the subpoenas.

7                                    **<u>BACKGROUND</u>**

8           Abu Zubaydah is a former detainee in the CIA's former detention and

9   interrogation program who is currently detained by the Department of Defense at the

10  United States Naval Station, Guantanamo Bay, Cuba.  On May 22, 2017, Abu

11

12  Zubaydah filed an *ex parte* application pursuant to 28 U.S.C. § 1782, seeking the

13  Court's authorization to serve deposition and document subpoenas on Dr. Mitchell and

14  Dr. Jessen, two psychologists who worked as independent contractors for the CIA in the

15  Agency's former program.  *See* ECF No. 1.  Abu Zubaydah represented that the purpose

16

17  of his subpoenas is to provide information to prosecutors in Poland for use in a Polish

18  criminal investigation regarding the CIA's alleged detention activities in Poland.  *See*

19  *id.* at 7-10.  On June 30, 2017, the United States filed a statement of interest in this case

20

21  opposing Abu Zubaydah' application.  *See* ECF No. 11.

22          On September 7, 2017, the Court granted Abu Zubaydah's application and

23  authorized service of the subpoenas on Dr. Mitchell and Dr. Jessen.  *See* ECF No. 23.

24  The Court analyzed the factors set out in *Intel Corp. v. Advanced Micro Devices, Inc.*,

25

26  542 U.S. 241, 260-65 (2004), and concluded that they collectively favored granting the

27  application.  *See id.* at 2-8.  The Court also emphasized that "[a]ddressing the issues of

28  classification and privilege is premature at this time."  *See id.* at 6.  Accordingly, the

UNITED STATES' MOTION TO QUASH SUBPOENAS - 3

Court set the return date for the subpoenas no earlier than 28 days after service and established a schedule for the filing of any motions to quash or motions for protective order no later than 21 days after service. *See id.* at 7-8. Abu Zubaydah served his subpoenas on October 4, 2017. *See* ECF No. 24.

Abu Zubaydah's subpoenas are premised on the allegation that the CIA conducted detention and interrogation operations in Poland or with the assistance of the Polish Government. The document subpoenas seek "all documents, memoranda, and correspondence" in the possession of Dr. Mitchell and Dr. Jessen in 13 broad categories related to alleged CIA detention and interrogation activities in Poland, as well as Poland's alleged participation in those alleged activities. *See* Mitchell Document Subpoena; Jessen Document Subpoena (attached as Exhibits 3-4). These categories include alleged documents concerning the alleged establishment and operation of a CIA detention facility in Poland (Requests #1-2), alleged correspondence between United States and Polish officials (Request #8) about the operation of the alleged detention facility in Poland, and alleged contracts between the United States and Poland concerning the alleged use of Polish property for the alleged detention facility (Request #12). *See id.* The deposition subpoenas do not identify the specific topics of inquiry, but based on Abu Zubaydah's representations in his Application, he seeks oral testimony from Dr. Mitchell and Dr. Jessen about the same subjects as the document requests. *See* Mitchell Deposition Subpoena; Jessen Deposition Subpoena (attached as Exhibits 5-6); Application at 9-10 (listing categories of information about alleged CIA

activities in Poland that Dr. Mitchell and Dr. Jessen are allegedly "in a position to describe").[1]

## **ARGUMENT**

### I.    **The Court Lacks Jurisdiction Over This Matter.**

This Court lacks jurisdiction over this case pursuant to 28 U.S.C. § 2241(e)(2), which bars non-*habeas corpus* actions "against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States" and who "has been determined by the United States to have been properly detained as an enemy combatant." 28 U.S.C. § 2241(e)(2); *Hamad v. Gates,* 732 F.3d 990 (9th Cir. 2013); *Al-Nashiri v. MacDonald*, 741 F.3d 1002 (9th Cir. 2013). These elements are satisfied in this case, as Abu Zubaydah is an alien who is currently detained by the United States; he was determined by the United States to have been properly detained as an enemy combatant through the

---

[1] Twelve of the 13 document requests expressly seek information about alleged detention and interrogation activities that allegedly occurred in Poland. *See* Exs. 1-2. The remaining catch-all request – Request #7 – seeks "all documents, memoranda, and correspondence concerning Petitioner Abu Zubaydah." Given the purpose of subpoenas and the representations made by Abu Zubaydah in his Application, the United States understands this request to seek documents related to Zubaydah's alleged detention in Poland. *See id.* Indeed, no justification or need for the discovery sought is explained or offered other than with regard to Zubaydah's alleged detention in Poland.

UNITED STATES' MOTION TO QUASH SUBPOENAS - 5

1   Department of Defense's Combatant Status Review Tribunal process, a point he

2   concedes (*see* Application at 3); and his subpoenas relate to his alleged detention,

3   transfer, treatment, and conditions of confinement.  Additionally, although the

4   subpoenas are directed to Dr. Mitchell and Dr. Jessen, they seek alleged information in

5   their possession that belongs to the United States and is protected from disclosure by

6   the state secrets privilege, thus this action is properly "against the United States."  *See*

7   *United States. v. Reynolds*, 345 U.S. 1, 7 ("The privilege belongs to the Government

8   and must be asserted by it").[2]

9   

10  

11      **II.    The State Secrets Privilege Bars The Discovery Sought By Abu**
12              **Zubaydah.**

13          Rule 45(d) provides that the Court "must quash or modify a subpoena that . . .

14  requires disclosure of privileged or other protected matter, if no exception or waiver

15  applies."  Fed. R. Civ. P. 45(d)(3)(iii).  Similarly, Rule 26(c) authorizes the Court "to

16  issue an order to protect a party or person from annoyance, embarrassment, oppression,

17  or undue burden or expense, including one or more of the following: (A) forbidding the

18  disclosure or discovery" and "(D) forbidding inquiry into certain matters."  Fed. R. Civ.

19  P. 26(c)(1).

20  

21  

22  

23  ─────────────

24          [2] Because this case involves an action against the United States relating to a

25  detainee who has been determined to be an enemy combatant, this case presents a

26  different situation than the one the Court addressed in *Salim v. Mitchell*, 2017 WL

27  390270 (E.D. Wash. Jan. 27, 2017).

28

Here, the Court should quash the subpoenas and issue a protective order because the state secrets privilege prohibits the depositions and document discovery sought by Abu Zubaydah. *See* 28 U.S.C. § 1782(a) ("A person may not be compelled to give his testimony or to produce a document or other thing in violation of any legally applicable privilege."). The subpoenas seek the disclosure of information that would fall within the same seven categories related to the CIA's former detention and interrogation program that the Court recently concluded are protected from disclosure under the state secrets privilege. *See Mitchell* Order at 4-14, 17-18, 20-21. As set forth below, CIA Director Pompeo has properly asserted the state secrets and related statutory privileges to protect these categories of information from disclosure in this case to prevent significant harm to the national security.

In particular, Abu Zubaydah's subpoenas are predicated on a singular allegation that the United States can neither confirm nor deny without risking significant harm to national security – that is, whether or not the CIA conducted detention and interrogation operations in Poland or with the assistance of the Polish Government. The Court should uphold the assertion of the state secrets privilege because Abu Zubaydah's subpoenas would require Dr. Mitchell and Dr. Jessen to answer questions or produce documents indicating whether or not the CIA conducted operations in Poland or with the assistance of the Polish Government. Indeed, the subpoenas seek information concerning the details of any such alleged operations. This entire line of inquiry is prohibited by the Court's decision in *Mitchell v. United States* and the Court of Appeals decision in *Jeppesen*, both of which concluded that information about whether or not any foreign government cooperated with the CIA in connection with the former detention and

1  interrogation program is properly protected from disclosure by the state secrets

2  privilege.  *Mitchell* Order at 20; *Jeppesen*, 614 F.3d at 1086.

3  **A.  The State Secrets Privilege and Standard of Review.**

4  The Supreme Court has long recognized that courts must act in the interest of the

5  country's national security to prevent disclosure of state secrets.  *See Reynolds*, 345

6  U.S. at 14; *Mitchell* Order at 4-5.  As relevant in this case, the state secrets privilege

7  operates as "an evidentiary privilege . . . that excludes privileged evidence from the case

8

9  . . . ."  *Jeppesen*, 614 F.3d at 1077.  When successfully invoked, the evidence subject to

10  the privilege is "completely removed from the case."  *Kasza v. Browner*, 133 F.3d 1159,

11  1166 (9th Cir. 1998).  In the normal course, after the privileged evidence is excluded,

12  "the case will proceed accordingly, with no consequences save those resulting from the

13  loss of evidence."  *Al-Haramain Islamic Found. Inc. v. Bush*, 507 F.3d 1190, 1204 (9th

14  Cir. 2007).  In other cases, however, "application of the privilege may require dismissal

15  of the action."  *Jeppesen*, 614 F.3d at 1083.  In this unique Section 1782 case, because

16

17  the only issue before the Court is whether the information requested by Abu

18  Zubaydah's subpoenas is protected by privilege, and the discovery is not sought in the

19  context of a pending civil action in a United States court, there is no need for the Court

20  to consider whether assertion of the state secrets privilege requires dismissal of a (non-

21

22  existent) civil action.

23  "[T]he Government may use the state secrets privilege to withhold a broad range

24  of information."  *Kasza*, 133 F.3d at 1166.  In assessing whether to uphold a claim of

25  the state secrets privilege, the Court does not balance the respective needs of the parties

26  for the information.  Rather, "[o]nce the privilege is properly invoked and the court is

27

28

satisfied as to the danger of divulging state secrets, the privilege is absolute." *Id*. Thus, although "the claim of privilege should not be lightly accepted," "even the most compelling necessity cannot overcome the claim of privilege" when it is properly asserted. *Reynolds*, 345 U.S. at 11; *Jeppesen*, 614 F.3d at 1081.

The Court of Appeals has also recognized that "the court's review of the claim of [state secrets] privilege is narrow." *Kasza*, 133 F.3d at 1166. The privilege must be sustained when the court is satisfied, "from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10. In conducting this analysis, the Court must afford "utmost deference" to the United States' privilege assertion and predictions of the harm that would result from disclosure of the information subject to privilege. *Kasza*, 133 F.3d at 1166.

Analyzing a state secrets privilege claim under this standard involves three steps. *Jeppesen*, 614 F.3d at 1080; *Mitchell* Order at 5-6. First, the Court must ascertain that the procedural requirements for invoking the privilege have been satisfied. *Id*. Second, the Court must determine whether the information is properly privileged. *Id*. Third, the Court must determine whether the case can proceed without risking the disclosure of the protected information.[3] *Id.*

**B.    The United States Has Properly Asserted the State Secrets Privilege.**

The United States must satisfy three procedural requirements to invoke the

---

[3] As noted above, there is no need for the Court to engage in the third step in this case. *See supra* at 8.

state secrets privilege formally: (1) there must be a "formal claim of privilege"; (2) the claim must be "lodged by the head of the department which has control over the matter"; and (3) the claim must be made "after actual personal consideration by that officer." *Jeppesen*, 614 F.3d at 1080. The United States has satisfied these requirements in this case.

First, the state secrets privilege has been formally asserted by the Director of the CIA through his public declaration. *See* Second Pompeo Decl. ¶¶ 2, 5-7.[4] The Director's declaration in this case also reaffirms and incorporates the declaration he submitted in *Mitchell v. United States* ("First Pompeo Decl." attached as Exhibit A to Second Pompeo Decl.), given the similarity between the types of information at issue in both cases. *Id.* at ¶¶ 1, 7. Second, the Director of the CIA is the head of the CIA, which has control over information implicated by Abu Zubaydah's subpoenas. *Id.* ¶ 1; First Pompeo Decl. ¶ 3. Third, the Director has personally considered the matter and has determined that a response to the subpoenas reasonably could be expected to cause serious, and in some cases exceptionally grave, harm to national

_____

[4] The assertion of the state secrets privilege in certain cases can involve the submission of both public and classified, *ex parte* declarations, such as when the information sought to be protected cannot be described on the public record. *See, e.g., Jeppesen*, 614 F.3d at 1085-86. Such classified submissions are not required, and here, because the existence of the program and a significant amount of information about the operation of the program have been declassified and publicly acknowledged, the Government is able to explain the basis for its privilege assertion in a public unclassified declaration.

UNITED STATES' MOTION TO QUASH SUBPOENAS - 10

1   security.  *See* Second Pompeo Decl. ¶¶ 2-21.

2   In addition to the foregoing procedural requirements established by the case

3   law, the Attorney General issued formal Executive Branch guidance in 2009

4   regarding the assertion and defense of the state secrets privilege in litigation.  *See*

5   Exhibit 7.  The United States represents that these standards and procedures were

6   followed in this case, including personal consideration of the matter by the Attorney

7   General and authorization by him to defend the assertion of the privilege.[5]  Here,

8   the United States has not only satisfied the procedural requirements for the assertion

9   of the state secrets privilege in the case law, it also has taken additional steps

10  acknowledged favorably by the Court of Appeals.  *See Jeppesen*, 614 F.3d at 1080.

11

12

13  **C.   The CIA Director Has Demonstrated That Disclosure of the Information Sought By Abu Zubaydah Risks Damage to National Security.**

14

15  Director Pompeo has formally asserted the state secrets privilege over seven

16  categories of information implicated by Abu Zubaydah's document and deposition

17  requests that cannot be disclosed without risking serious – and in some instances,

18  exceptionally grave – danger to the national security of the United States.  *See* Second

19  Pompeo Decl. ¶¶ 6-7.  Director Pompeo previously asserted the state secrets privilege

20  over these same seven categories of information in *United States v. Mitchell* and his

21  declaration in that case, which he reaffirms again for purposes of this case, explains the

22

23

24

25  [5] In a case such as this one where the Department of Justice is defending the assertion of

26  the state secrets privilege by another government agency, a declaration from the

27  Attorney General is not required.  *Jeppesen*, 614 F.3d at 1080; *Mitchell* Order at 7.

28

UNITED STATES' MOTION TO QUASH SUBPOENAS - 11

significant harm to national security that would result from disclosure of these categories of classified information:

- Information that could identity individuals involved in the CIA's former detention and interrogation program (First Pompeo Decl. ¶¶ 13-22);

- Information regarding foreign government cooperation with the CIA (First Pompeo Decl. ¶¶ 23-25);

- Information pertaining to the operation or location of any clandestine overseas CIA station, base, or detention facility (First Pompeo Decl. ¶¶ 26-29);

- Information regarding the capture and/or transfer of detainees (First Pompeo Decl. ¶¶ 30-31);

- Intelligence information about detainees and terrorist organizations, to include intelligence obtained or discussed in debriefing or interrogation sessions (First Pompeo Decl. ¶¶ 32-34);

- Information concerning CIA intelligence sources and methods, as well as specific intelligence operations (First Pompeo Decl. ¶¶ 35-39);

- Information concerning the CIA's internal structure or administration (First Pompeo Decl. ¶¶ 40-42).

*See* First Pompeo Decl. at ¶¶ 7-12; Second Pompeo Decl. ¶¶ 1, 7.

In this case, the central allegation that underlies Abu Zubaydah's subpoenas is whether or not the CIA conducted detention and interrogation operations in Poland or with the assistance of the Polish Government. Consequently, the subpoenas implicate two of the above categories of information about the CIA's former detention and interrogation program that remain classified at the TOP SECRET level and protected from disclosure by the state secrets privilege: (a) information regarding foreign government cooperation, and (b) information

pertaining the operation or location of any clandestine overseas CIA station, base, or detention facility. *See id.* ¶ 9. Accordingly, Dr. Mitchell and Dr. Jessen cannot respond to Abu Zubaydah's subpoenas without improperly either confirming or denying the existence or nonexistence of a clandestine CIA detention facility in Poland, or whether or not the Polish government clandestinely assisted the CIA in connection with the former program. *See id.*

Director Pompeo's declaration explains in detail why information about alleged foreign government cooperation with the CIA and locations of clandestine CIA overseas facilities cannot be divulged without risking significant damage to the national security. *See* Second Pompeo Decl. ¶¶ 8-21; *see also* First Pompeo Declaration ¶¶ 23-29. First, disclosing the existence of a clandestine intelligence relationship or the extent to which a foreign government is covertly cooperating or sharing intelligence with the CIA is likely to have serious negative consequences for any foreign liaison assistance the CIA may receive from that country. *See* Second Pompeo Decl. ¶ 11. The CIA is engaged in authorized counterterrorism operations and intelligence collection activities every day around the globe in furtherance of the safety and security of the United States. *Id.* ¶ 10. Foreign liaison services are vital to the CIA's world-wide efforts to collect intelligence and thwart terrorist attacks. *Id.* These services serve as a force multiplier by directing their resources at common goals shared with the United States in counterterrorism operations and intelligence gathering. *Id.* Because foreign intelligence services serve as a direct source of intelligence and act as partners in joint operations, such services are a critical intelligence source, and the CIA's relationship with them is an

intelligence method that must be protected.  *Id.*

As a clandestine intelligence service, the CIA has a duty to maintain the secrecy of its liaison relationships.  *Id.* ¶11.  Disclosure of a clandestine relationship is a breach of trust on which the relationship is based, and can lead to a less robust relationship or even a termination of the relationship altogether.  *Id.*  This damage to a liaison relationship is likely to compromise the CIA's ability to obtain critical intelligence information from the country's intelligence service or secure cooperation from the country in current and future high-risk counterterrorism operations.  *Id.*  For example, disclosing the existence of a clandestine intelligence relationship or the extent to which a foreign government is covertly cooperating with and sharing intelligence with CIA could embarrass the foreign government or aggravate internal political dissent in that country.  *Id.*  This, in turn, would make the country less likely to share intelligence or assist the CIA with its operations.  *Id.*

Second, one predictable response to disclosing information about the CIA's clandestine liaison relationships is for a foreign government to publicly distance itself from the United States Government or the CIA, or take other measures to reduce the effectiveness of the CIA.  *Id.* ¶ 12.  For example, a country could demand that the CIA remove one or more officers from that country or harass CIA officers.  *Id.*  These actions could complicate CIA intelligence operations, possibly shutting down or curtailing operations, resulting in a reduction or elimination of intelligence.  *Id.*

Third, and more broadly, if the CIA appears unable or unwilling to keep its clandestine liaison relationships secret, relationships with other foreign intelligence

or security services could be jeopardized as well. *Id.* ¶ 13. It is critical that the CIA preserve the confidentiality of its liaison relationships in order demonstrate to partner governments that the CIA can be trusted to maintain the secrecy of these agreements. *Id.* For example, when trying to work with foreign intelligence services in the present day, the CIA needs them to have confidence that the CIA will not acknowledge coordinated clandestine activities. *Id.* If governments or intelligence services become distrustful of the CIA's ability to maintain the confidentiality of these arrangements, they will understandably be reluctant to cooperate with the CIA if they believe the CIA would disclose the arrangement. *Id.* The loss of trusted intelligence partners, and the intelligence information and operational support they can provide, would have significant harmful effects on the national security. *Id.*

Fourth, disclosing classified information pertaining to countries and foreign services that clandestinely assist the CIA would also increase the risk that terrorists or other bad actors would target those countries with acts of extreme violence. *Id.* ¶ 14. Terrorist organizations, in particular, often seek to plan attacks in locations that U.S. Government personnel are perceived to frequent. *Id.* Public disclosure of the fact that the CIA has a liaison relationship with a given country increases the likelihood of an attack in that location. *Id.*

Similar harm to national security is likely to result from disclosing the location of CIA stations, bases, and detention facilities. *Id.* ¶ 15. Acknowledging the location of covert facilities can endanger the physical safety of covert CIA officers who work at those locations by, among other things, significantly

UNITED STATES' MOTION TO QUASH SUBPOENAS - 15

increasing the likelihood that those locations could be targeted for terrorist attacks. *Id.* Such official acknowledgments are also reasonably likely to cause complications for host countries, given that official acknowledgment of CIA facilities within their borders could incite a backlash from elements of their citizenry. *Id.* Public embarrassment for the host country could have a negative impact on the CIA's relationship with the host country, to include curtailed intelligence sharing and cooperation that would greatly diminish the CIA's overseas intelligence collection, which in turn would diminish the quality of Agency intelligence assessments for senior U.S. policymakers. *Id.* Further, confirming the location of covert CIA overseas facilities signals to adversaries where the CIA has an interest and conducts operations, thus providing those entities with valuable information that they could utilize to thwart the CIA's intelligence mission. *Id.*

In sum, the declarations submitted by Director Pompeo amply satisfy the United States' burden of establishing a "reasonable danger" that a response from Drs. Mitchell and Jessen concerning the categories of information Abu Zubaydah seeks in this case—that is, information tending to confirm or deny whether the CIA conducted detention and interrogation activities in Poland, or with the assistance of the Polish Government—would be detrimental to the national security and, accordingly, implicate valid state secrets, "which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 9-10.

### D. Unofficial Public Speculation About The Foreign Governments That Allegedly Assisted the CIA Does Not Undermine The Assertion Of The State Secrets Privilege.

The assertion of the state secrets privilege in this case is unaffected by

Petitioner's allegations, or any other unofficial public speculation, that the CIA received assistance from Poland during the operation of the former detention and interrogation program.

The United States acknowledges that there have been allegations and much public speculation about which foreign countries and intelligence services assisted the CIA's former detention and interrogation program, including allegations by journalists, non-governmental organizations, and former Polish Government officials that the CIA operated a detention facility in Poland. *See* Second Pompeo Decl. ¶ 16.[6]  The CIA, however, has steadfastly refused to confirm or deny the accuracy of such speculation.  *See* Second Pompeo Decl. ¶ 16.  Indeed, the CIA has never officially acknowledged whether or not any particular foreign country hosted a clandestine CIA detention facility as part of the Agency's former detention and interrogation program.  *Id.*  Consequently, this information remains classified and unofficial allegations do not lessen the harms to the national security discussed above that reasonably could be expected to result from Drs. Mitchell or Jessen confirming or denying, explicitly or in connection with document production, whether or not the CIA conducted detention and interrogation operations in Poland or with the assistance of the Polish Government.  *See id.* ¶ 17.

_____

[6] *See, e.g.*, Carol Williams, Polish Ex-Leaders Confess Complicity After CIA Torture Report, Los Angeles Times (Dec. 10, 2014) (attached as Exhibit 8); Amnesty International Report, Breaking the Conspiracy of Silence:  USA's European "Partners in Crime" Must Act After Senate Torture Report (January 2015) (attached as Exhibit 9).

Although much information about the former detention and interrogation program has been officially declassified and released to the public, the CIA has not wavered in its commitment to protect the location of detention facilities and the identity of foreign partners who stepped forward in the aftermath of the September 11, 2001 attacks to join the fight against al-Qa'ida. *Id.* ¶ 19. It is critical that the CIA maintain its commitment of confidentiality to these countries. *See id.* Foreign partners must be able to trust the CIA's ability to honor its pledge to keep any clandestine cooperation with the CIA a secret even when time passes, leaks to the media occur, or the political and public opinion winds change in those foreign countries. *Id.* For instance, when trying to convince foreign intelligence services to work with the CIA in the present day, the CIA needs them to have confidence that, years down the line, the CIA will continue to stand firm in safeguarding any coordinated clandestine activities even if new political parties or officials come to power in those foreign countries that want to publicly atone or exact revenge for the alleged misdeeds of their predecessors. *Id.* The CIA's ability to maintain and develop relationships with foreign intelligence services depends on steadfast adherence to this commitment. *Id.*

The absence of any official acknowledgment by the CIA regarding the location (or not) of detention facilities and the identity of foreign partners is important to the protection of the CIA's intelligence mission. *Id.* ¶ 17. Public speculation about the identities of the countries that assisted the CIA in connection with the program – whether through media reporting, reports from non-governmental organizations, or otherwise – does not equate to declassification and official acknowledgment of any information by the CIA. First Pompeo Decl. ¶ 18;

UNITED STATES' MOTION TO QUASH SUBPOENAS - 18

*see Pickard v. Dep't of Justice*, 653 F.3d 782, 786 (9th Cir. 2011).  The absence of official confirmation from the CIA leaves an important element of doubt about the veracity of information and, thus, carries with it an additional layer of protection and confidentiality.  *See* Second Pompeo Decl. ¶ 17.  "There may be much left to hide, and if there is not, that itself may be worth hiding."  *See Phillippi v. CIA*, 655 F.2d 1325, 1331 (D.C. Cir. 1981).  That protection would be lost if the CIA were forced to confirm or deny the accuracy of speculation or unofficial disclosures.  *Id.*; *see Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009); *Frugone v. CIA*, 169 F.3d 772, 774-75 (D.C. Cir. 1999).  Accordingly, in light of the harms discussed above, the CIA cannot officially acknowledge allegations that would confirm or deny the existence of a classified intelligence relationship with a foreign government.  *See* Second Pompeo Decl. ¶ 17.

Courts have recognized "a critical difference" between official disclosures by the Executive Branch and other forms of unofficial allegations based on the very different harms that the two types of communications could have on the United States' national security and foreign policy interests.  *See Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990).  Whereas "[u]nofficial leaks and public surmise can often be ignored by foreign governments that might perceive themselves to be harmed by the disclosure of their cooperation with the CIA," the same is not true of an "official acknowledgement," which "may force a government to retaliate."  *Afshar v. Dep't of State*, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983); *see also Phillippi*, 655 F.2d at 1332-33 (official acknowledgment by CIA officials "could have an adverse effect on our relations with" foreign countries).  Unofficial allegations may not be sufficient to motivate hostile entities or foreign

governments to take action against the CIA in the same manner and with the same intensity as would an official acknowledgment by the CIA.  Second Pompeo Decl. ¶ 17.  By contrast, these entities could not ignore, dismiss, or downplay an official acknowledgment by the CIA.  *Id.*  Such unofficial disclosures or speculation may not be presumed accurate or reliable by the public or by foreign adversaries or governments, and any requirement that the United States officially confirm or deny such allegations would in itself provide a confirmation that harms national security.  *See Wilson*, 586 F.3d at 186-87; *Afshar*, 702 F.2d at 1133-34.  Indeed, "the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm."  *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007).

For these reasons, the CIA cannot officially acknowledge allegations that would confirm or deny a classified intelligence relationship with a foreign government.  Second Pompeo Decl. ¶ 17.  Were it otherwise, and the CIA was forced to deny such allegations when they are incorrect, the CIA's failure to deny other allegations in other circumstances would be tantamount to an official admission of such activities.  In that event, the Government's ability to protect national security information would improperly turn on whether information has been disclosed without authorization, and whether such unofficial disclosures turn out to be correct.  *Cf. Hunt v. CIA*, 981 F.2d 1116 (9th Cir. 1992) (CIA can refuse to confirm or deny an allegation when such confirmation or denial itself would reveal privileged information).

The United States also acknowledges that the regional prosecutor's office in Krakow, Poland, has an open criminal investigation into alleged CIA detention activities in Poland.  Second Pompeo Decl. ¶ 18.  But even in situations when former

UNITED STATES' MOTION TO QUASH SUBPOENAS - 20

officials with a foreign government make allegations about CIA activities or certain

components of a foreign government attempt to take action in response to alleged

intelligence activities with the CIA, harm to the national security would still result were

the CIA to confirm or deny the nature of the alleged activities.  *Id.*  The CIA's ability to

maintain a cooperative and productive intelligence relationship with foreign intelligence

and security services is separate from whatever activities may be undertaken by other

elements of that government or former officials no longer connected with the

government.  *Id.*  Relationships with these intelligence and security services are

extremely sensitive and based on mutual trust that the classified existence and nature of

the relationship will not be disclosed.  *Id.*  Therefore, it is of the utmost importance that

the CIA not take any action that could jeopardize these clandestine relationships, lest

the CIA lose the ability to receive critical intelligence and operational support from

these foreign intelligence services, as well as from other current or potential intelligence

partners.  *Id.*  The resulting damage to the national security from reduced or terminated

intelligence sharing relationships could be severe.  *Id.*

Here, where Director Pompeo has explained with specificity the harm to national

security reasonably likely to result from officially confirming or denying the foreign

governments that assisted the CIA in its operation of the former program, the Court

must give the "utmost deference" to that judgment and uphold assertion of the state

secrets privilege.  *See Kasza*, 133 F.3d at 1166.

### E.    Prior Decisions From This Court And The Courts of Appeals Support Assertion Of The State Secrets Privilege In This Case.

Other courts have held that the same or similar types of information at issue

in this case are properly protected by the state secrets privilege.  *See Mitchell* Order

at 4-15, 17-18, 20-21; *Jeppesen*, 614 F.3d at 1086; *Abilt v. CIA*, 848 F.3d 305, 315

(4th Cir. 2017); *Sterling v. Tenet*, 416 F.3d 338, 345-46 (4th Cir. 2005); *El-Masri v.*

*United States*, 479 F.3d 296, 308-313 (4th Cir. 2007).

As explained above, in *Mitchell v. United States*, this Court recently upheld

the United States' assertion of the state secrets privilege over the identical

categories of information related to the operation of the CIA's former program.

*See Mitchell* Order at 20 ("The court finds the disclosure of the categories of

information described in the Pompeo Declaration, including: information

identifying covert agents; information concerning the involvement of foreign

countries; information obtained concerning terrorist organizations; and information

involving intelligence sources and methods – could cause significant harm to

national defense or foreign relations.").  The Court should reach the same

conclusion in this case, as Director Pompeo has submitted a similarly "thorough and

detailed [d]eclaration" explaining the harm to national security reasonably likely to

result from the disclosure of this information.  *See id.* at 7.

The assertion of the state secrets privilege in this case is further supported by

the en banc Court of Appeals decision in *Jeppesen*, which upheld assertion of the

privilege in the context of a damages lawsuit concerning the operation of CIA's

former program, notwithstanding public statements from foreign government

officials about those governments' alleged participation in the program.  Indeed, the

Court of Appeals upheld assertion of the privilege with respect to "information

about whether any foreign government cooperated with the CIA in clandestine

intelligence activities" – the same key category of information that underlies Abu

Zubaydah's subpoenas here.  *Jeppesen*, 614 F.3d at 1086.  The Court of Appeals

reached this conclusion notwithstanding the "hundreds of pages of publicly

available documents" that the plaintiffs submitted in support of their allegation that

the contractor-defendant assisted the CIA in its operation of the program.  *Id.* at

1089-90.  Indeed, plaintiffs' argument to the *en banc* Court of Appeals emphasized

that the state secrets privilege should not apply because a large number of foreign

governments had made public statements about their alleged participation in the

CIA's program.  *See* Reply Brief of Plaintiffs at *22-29, 2009 WL 6635971 (9th

Cir. Nov. 27, 2009).  This argument was rejected by the en banc court, which

concluded that any effort by the contractor to defend against the plaintiffs'

allegations would "unjustifiably risk disclosure of state secrets."  *Jeppesen*, 614

F.3d at 1090; *see also id.* at 1102-1131 (Hawkins, J. dissenting) (chart attached to

the dissenting opinion summarizing "some 1,800 pages" of information submitted

by plaintiffs, including documents and public statements from foreign governments

regarding their alleged participation in the CIA's former program).  Accordingly,

"the rationale underlying application of the state secrets privilege in [*Jeppesen*]

strongly supports application of the privilege here."  *Mitchell* Order at 20.

      Similarly, in *El-Masri v. United States*, 479 F.3d 296 (4th Cir. 2007), the

Court of Appeals for the Fourth Circuit expressly considered whether statements by

foreign governments could undermine the assertion of the state secrets privilege in

the context of a damages action brought by a former detainee alleged

to have been detained in the CIA program.  "The heart of El-Masri's appeal is his

assertion that the facts essential to his Complaint have largely been made public, either in statements by United States officials or in reports by media outlets and *foreign governmental entities*." *Id.* at 308 (emphasis added); *see also* El-Masri's Opening Brief, 2006 WL 2204857 at* 36 (4th Cir. July 24, 2006) (citing foreign government reports). The court rejected this argument: "[W]e must reject El-Masri's view that the existence of public reports concerning his alleged rendition (and the CIA's rendition program in general) should have saved his Complaint from dismissal." *Id.* at 311. In upholding the state secrets privilege assertion, the court emphasized that the government defendants and alleged CIA contractors "could not properly defend themselves without using privileged evidence" and would likely have to disclose information regarding the "means and methods by which the CIA gathers intelligence" to include whether the CIA relied on the assistance of "another government" in the program. *Id.* at 309.

These decisions are fully consistent with the Supreme Court's decision in *Reynolds*, which held that the state secrets privilege belongs exclusively to the United States, and can be waived only by the United States, not a private party. *See Reynolds*, 345 U.S. at 7; *Mitchell* Order at 17-18. Accordingly, media reports and statements of foreign government officials cannot bind the United States and have no bearing on the applicability of the state secrets privilege, because they do not constitute an official disclosure of classified information.

### III.    The CIA Act And National Security Act Protect The Disclosure Of Information Sought By Abu Zubaydah.

In addition to the state secrets privilege, Director Pompeo has also asserted statutory privileges under the National Security Act of 1947 (50 U.S.C. § 3024(i)), which "protect[s] intelligence sources and methods from unauthorized disclosure," and the Central Intelligence Agency Act of 1949 (50 U.S.C. § 3507), which prohibits the "disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency."   *See* Second Pompeo Decl. ¶ 3.  These statutory privileges provide additional, independent bases to withhold the categories of information discussed above.  *See* First Pompeo Decl. ¶¶ 22, 25, 29, 31, 34, 39, 42*; see also Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 503-05 (S.D.N.Y. 2010) (holding that Freedom of Information Act request seeking information about the CIA's former program, including the CIA's relationships with foreign liaison services and governments as well as covert field installations, was properly denied as "intelligence sources and methods" under the National Security Act); *Minier v. CIA*, 88 F.3d 796, 801 (9th Cir. 1996) ("there can be no doubt" that the CIA Act "authorizes the CIA's refusal to confirm or deny the existence of an employment relationship" and the CIA "may also decline to disclose [the employee's] alleged CIA activities.").

### CONCLUSION

For the reasons stated above, the Court should quash Abu Zubaydah's subpoenas and enter a protective order prohibiting enforcement of the subpoenas and any disclosure in response to the subpoenas.  A proposed order is attached.

Dated: October 24, 2017                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General

                                           JOSEPH H. HARRINGTON
                                           Acting United States Attorney

                                           TERRY M. HENRY
                                           Assistant Branch Director

                                             *s/ Andrew I. Warden*
                                           ANDREW I. WARDEN (IN Bar 23840-49)
                                           Senior Trial Counsel
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Avenue NW
                                           Washington, D.C. 20530
                                           Tel: (202) 616-5084
                                           Fax: (202) 616-8470
                                           E-Mail: andrew.warden@usdoj.gov

                                           Attorneys for the United States of America

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 24, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Jerry Moberg:                              Christopher W. Tompkins
jmoberg@jmlawps.com                        ctompkins@bpmlaw.com

David Klein:                               *Attorney for Respondents*
David.Klein@pillsburylaw.com

John Chamberlain:
John.Chamberlain@pillsburylaw.com

*Attorneys for Petitioners*

<u>/s/ Andrew I. Warden</u>
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue NW
Washington, D.C. 20530
Tel: (202) 616-5084
Fax: (202) 616-8470
E-Mail: andrew.warden@usdoj.gov

*Attorney for the United States*

UNITED STATES' MOTION TO QUASH SUBPOENAS